ABRAHAM RICH *vs.* ALVAH R. HAYES, Admr.

Kennebec.    Opinion May 16, 1904.

*Contracts*, between mortgage parties.  Subsequent rights.   *Fraud*, effect of on contracts executed and executory.   *Mortgages.    New Trial.*

The legal representative of the plaintiff's mortgagees agreed not to enforce at law or in equity any of the unsecured claims of the mortgagees against the plaintiff's equity of redemption.

*Held;* that there is nothing in the contract to prevent such representative or the heirs of the mortgagees acquiring subsequently the legitimate claims of other parties, and unless at the time the contract was made such representative entertained the design by thereafter acquiring and enforcing such claims to prevent the plaintiff from obtaining the benefit of the contract, their subsequent acquisition would not be in violation of it.

Between the parties to a contract fraudulent as to creditors so far as it is executory it cannot be enforced; so far as it is executed, the law leaves the parties where it finds them.   Its aid cannot be invoked to restore to a party property with which he has parted in pursuance of his fraudulent contract and design.

A verdict which is unsupported by the evidence cannot be sustained by the assumption as a fact of a controverted point that was not submitted to the jury.

See *Same* v. *Same*, 97 Maine, 293.

Motion by defendant.    Sustained and new trial granted.

This was an action on the case to recover on a promissory note for $3,000.    The plea was the general issue with a brief statement that

the note had been settled by reason of an agreement entered into between the parties, two years previous to the commencement of the action.    The verdict was for the plaintiff in the sum of $2,581.75.

It came before the law court on a motion for a new trial as against evidence.    The case appears in the opinion.

*Jos. Williamson and L. A. Burleigh,* for plaintiff.

*Geo. W. Heselton,* for defendant.

SITTING:  WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

POWERS, J.    Assumpsit on a promissory note for $3,000 and interest, dated Dec. 29, 1894, payable to the plaintiff and signed by Dingley Brothers.    The verdict was for the plaintiff and the defendant moves to set it aside as against evidence.

The following facts are uncontroverted.    On Dec. 28, 1894, the plaintiff gave to Dingley Brothers his three notes of $1,000 each secured by a mortgage on his homestead, receiving as the consideration therefor the note in suit.    Fred B. Dingley, the administrator of Fuller Dingley, who was the surviving partner of Dingley Brothers, brought a writ of entry to foreclose this mortgage.    The case went to trial at the March term, 1898, of this court in Kennebec, upon the question of the amount due upon the mortgage, and the genuineness of a certain agreement, produced by Rich and purporting to be signed by Dingley Brothers, to the effect that the mortgage should not be foreclosed without his consent in writing being first obtained.    A settlement was made by which the case was dismissed without cost and the following agreement under seal signed by the parties and extended on the back of the mortgage:

"In consideration of one dollar to the other paid by each Fred B. Dingley, Administrator de bonis non of Fuller Dingley, who was surviving partner of the within named Dingley Brothers, mortgagee, and Abraham Rich, mortgagor within named, hereby modifies the terms and conditions of this mortgage as follows:

First:    The amount due at this date on the mortgage debt is three thousand dollars.

Second: Interest is to be paid on said three thousand dollars at the rate of three per cent per annum, payable semi-annually.

Third: The mortgagor is to pay the taxes, insurance and keep the premises in repair.

Fourth: The mortgagor shall not commit strip or waste, and the mortgagee agrees not to enforce at law or in equity any of the unsecured claims of Dingley Brothers against the right of redemption on said premises.

Fifth: In case of default in performance of any of the foregoing agreement by the mortgagor for sixty days, the mortgagee may thereupon take actual possession of the premises and the mortgagor agrees to so surrender possession.

Sixth: The principal of said debt (said three thousand dollars) shall not be due until default in the foregoing agreement, and sixty days thereafter, but shall become due on the death of said Rich and possession shall be surrendered in ninety days after such death."

At the same time, and as a part of the same settlement, the note in suit in this case and the controverted agreement purporting to be signed by Dingley Brothers were delivered to the clerk of courts in a sealed envelope with this memorandum thereon signed by the attorneys for the several parties: "To be kept on file, not to be delivered to either party." It was also understood and agreed, though not reduced to writing, that if the agreement indorsed upon the mortgage was violated, then Rich was to again have the possession of the papers in the envelope with all his original rights under the same.

Before this settlement, one Hilton as an administrator, had attached the equity of redemption in the mortgaged premises in a suit against Rich, which suit was then entered and pending in court. Judgment was afterwards rendered, execution issued, and the equity of redemption sold for $76.59 on June 27, 1898, to Mr. Heselton, who had been the attorney for the administrator in the writ of entry. This sale was not redeemed from, and on Aug. 5, 1899, a writ of entry was brought by Heselton, judgment for possession obtained, and execution issued Jan. 1, 1900. Jan. 9, 1900, Heselton quitclaimed the premises to the heirs of James B. Dingley, who when living was

one of the firm of Dingley Bros., for $80 consideration.   March 19, 1898, said equity was also attached upon a writ issued out of Mr. Heselton's office against Rich and in favor of one Robbins.   In this suit judgment was rendered, execution issued and the equity of redemption sold to Fred B. Dingley May 30, 1899, for $100.   The writ in the present case is dated April 9, 1900.

The plaintiff claims to maintain the present suit on two grounds.

I.   It is claimed that the purchase of the equity of redemption by the heirs of James B. Dingley and by Fred B. Dingley was a violation of that part of the agreement of March 30, 1898, which says: "The mortgagee agrees not to enforce at law or in equity any of the unsecured claims of Dingley Bros. against the right of redemption on said premises."   Dingley Bros. had at the time certain unsecured claims against the plaintiff Rich.   The letter of the agreement applies to these and to these alone.   Neither the Hilton nor the Robbin's claim on which the equity of redemption was sold was among the number; and there is no evidence that Dingley Brothers or their heirs or legal representatives had at that time any interest in either of these claims.   The object of that agreement was however to give to the plaintiff the right to enjoy the equity of redemption during his life upon his complying with its terms as to the interest, taxes, insurance, strip and waste, all of which it is admitted he fulfilled.

The jury were instructed that "if at this time Fred B. Dingley fraudulently, for the purpose of depriving Capt. Rich of what they were purporting to give him, then and there had devised the scheme and had contemplated the programme of buying in judgments of the other independent creditors, and that was a part of his fraudulent intention at the time he signed these stipulations upon the mortgage and at the time of the settlement, if he did have this fraudulent intention to in this way deprive Capt. Rich of what apparently he was giving him, and if he carried that out, then I instruct you for the purpose of this trial that it would be a failure on his part to keep the spirit of his part of the contract and this suit may be enforced upon the note."   The jury were further instructed that the effect would be the same if such an intention was entertained by Mr. Dingley's

attorney at the time of the settlement and that intention was afterwards adopted and carried out by Mr. Dingley.

It is evident that these instructions were sufficiently favorable to the plaintiff. There was nothing in the contract to prevent the mortgagee acquiring subsequently the legitimate claims of the other parties, and unless he at the time entertained the design by thereafter acquiring and enforcing such claims to prevent Mr. Rich obtaining the benefit of the contract, their subsequent acquisition would be an innocent transaction.

In order to return a verdict for the plaintiff the jury must have found that such a design was entertained at the time by either Mr. Dingley or his attorney. This finding is wholly unsupported by the evidence. After a careful examination of the printed case we cannot find in the record any testimony tending to show such a design or any fact or circumstance from which it can follow as a legitimate inference. The seizures, sales and purchase of the equity of redemption appear to have been in the ordinary course of business. In enforcing the claims of his clients, Hilton and Robbins, against the equity, Mr. Heselton did nothing but what his duty to them required him to do. At the time the heirs of James B. Dingley purchased the equity of redemption, the plaintiff's right of redemption from the sheriff's sale had expired. There is no evidence that the administrator ever heard of this claim prior to that date. When the administrator bought the Robbins claim, Robbins, after execution issued, sought him out at his house where he was sick and after several meetings made arrangements with him to take the claim for a note for $150 owed by Robbins to Dingley Brothers. Robbins then notified his attorney to sell the premises to Fred B. Dingley for $100 if there were no other bidder. There is no evidence that Mr. Dingley ever heard of the Robbins claim until Mr. Robbins came to to his house. The jury must have misapprehended the evidence or disregarded their duty.

II. The plaintiff's counsel claim to sustain the verdict on the ground that the settlement of March 30, 1898, was in fraud of his own creditors, in that it recited that the amount due upon the mort-

gage was $3,000, when in fact it was only $1,500 for the purpose of having the evidence of the incumbrance appear greater than it actually was.

This fact however is not admitted, and a sufficient answer to the plaintiff's position is that the question was not submitted to the jury and non sequitur that the jury would have found in favor of the plaintiff's contention. The plaintiff testifies positively that there was $3,000 due on the mortgage. It was given for that sum and the note of Dingley Bros. which the plaintiff received for it was for that amount. There is no evidence coming from the plaintiff or anyone else that anything had ever been paid on it. At the trial of the writ of entry, the representative of Dingley Bros. contended that some $2,800 had been advanced upon the mortgage; Mr. Rich claimed that it was only $1,377.45. For the purpose of the settlement the sum was finally fixed at $3,000 at 3 % instead of $1,500 at 6 %. It is not certain that in doing this Fred B. Dingley intended to act in fraud of Mr. Rich's creditors. It represented in amount simply what it was claimed had been advanced by Dingley Bros. with the accumulated interest, and Mr. Rich now swears positively that there was $3,000 due.

Even if the truth of the counsel's contention were admitted or so clearly proven that a verdict based upon a contrary conclusion could not stand, it would not help the plaintiff in this case. An examination of the indorsement upon the envelope, together with the deposit of the note in suit with the clerk of courts, shows that the plaintiff did something more than merely enter into an agreement not to sue so long as the agreement in regard to the mortgage was kept. He agreed to surrender and did in fact surrender his possession and property in the note in suit until breach of the mortgage agreement. To this extent the contract of the parties, even though fraudulent as to creditors, was executed, and the law will not interpose to restore to the plaintiff that with which he had parted in pursuance of his fraudulent contract and design. Without such possession or property the plaintiff cannot maintain his suit. He did something more than agree not to sue; he put it out of his power to sue. The note was "to be given up to neither party." This necessarily imports that it

had been already given up by the plaintiff. In order that he may maintain this suit, he asks the law to undo what he had done, to give back to him what he had given up. This the law does not do. So far as the contract, if fraudulent, is executory it cannot be enforced, so far as it is executed the law leaves the parties where it finds them. Its aid cannot be invoked to restore to the plaintiff the property in and the possession of the note which he surrendered for the purpose of defrauding his creditors. From this part of the contract which he has executed he can be relieved only in accordance with the terms of the contract, viz, by showing a breach of the terms of the mort-gage agreement, and of this there is no evidence.

<em>Motion sustained.    Verdict set aside.    New trial granted.</em>